Third case, Castro v. DeVry University. Mr. Crooks. Good morning and thank you, Your Honors. Thomas Crooks on behalf of the Plaintiff Appellants. Your Honor, it's our position that summary judgment never should have been granted in this case. The record is filled with disputed facts from which inferences can be drawn, and I want to highlight a couple of those for you right now. As you recall, it's April 16, 2007, when Liz Castro and two people she supervised, Mike Flores and Tanya Brooks, all went to the HR department to complain about the conduct of their boss, Mr. Gamboni. They complained about racial and ethnic slurs and distasteful comments that he made. When they returned to the office, ten minutes after they made this report, Mr. Gamboni came into Liz Castro's office angry, furious, said things like, Do you have something you want to tell me about? Do you want to talk to me about something? And then he had her do what's called phone work, something you do with a new hire, something that Liz had not done with Phil for over eight years. And it's our position that we can infer from that that Mr. Gamboni was told of the complaint, disregarding his claim that it was weeks later before he heard it. The district court rejected that inference and determined that he was not aware of the complaint to HR. Twelve days later, on April 28, there was a staff meeting that Liz Castro was present for, and at the meeting, as they discussed sales, she brought up the issue of a problem with leads. Sophomore leads had been given out, and what that means is names of sophomores were given to try to sell to go to college. They were still two years away from college. It was an error, and there was just a note made, let's try not to make that mistake. She was attacked by Christine Hurl, her ultimate far-up supervisor, to the point where she was reduced to tears. And what happened at that meeting and how she raised that issue is another disputed issue, and we have independent witnesses that find that that reaction by Christine Hurl was totally unnecessary and inappropriate. More importantly, as they left this meeting, Liz Castro overheard Christine Hurl say to Phil Gamboni, we're not going to let a bunch of wetbacks run this office. Who said that? Christine Hurl. She was three levels above, but ultimately was a manager above Liz Castro and the other plaintiffs. Did she replace Gamboni? Gamboni wasn't terminated. Gamboni was given a lateral transfer. He was transferred somewhere. He was given a lateral transfer that allowed him to work from home, which is what he preferred. So while it was lateral to him, it was a great step. But he was out of there. He was out of there, that's correct. July 2007 then, two months later, after the July class, the most important class had been set, there's a meeting. At that meeting, Castro was summarily demoted and shipped from the Chicago office to Addison, not by her choosing. Most important of all, the new supervisors that came in, Kathleen Berry, Ms. Strauss, made statements to everybody to the effect, don't go to HR. If you've got a problem, you settle it in-house. Now most of us understand that HR is there for employees to go to, particularly if they have issues with their supervisors, and yet they were making a very strong showing both to the whole group and then individually to Brooks and Castro by Strauss. We're told, don't go to HR. Strauss specifically said, Kathy Berry does not want you to go to HR, and Berry made similar statements. Again, I think an inference can be drawn from that. All this discussion about HR, don't go there. Don't do what had just been done. In fact, at this very same time, Phil Gamboni said to Mike and Latanya, actually said to Mike Flores, you see what happens to people that aren't loyal. You see the person that wasn't loyal is gone, obviously referring to Liz Castro. Mr. Kirks? Yes. Obviously, a lot of these events were far, far before the terminations that are the actual issues in this case. Correct. I'd like to ask you a couple of factual issues about that. Sure. At page 40 of your brief, you're telling us that the response to Mr. Flores' EEOC charge was false about whether Berry had known of Flores' complaint, which is kind of central to your retaliation claim. Are you with me? Okay. Page 40 of my brief. Yes, sir. I don't see a record site. What are you specifically referencing me to? This is an important factual assertion that Hurt drafted a position statement for DeVry in which he or she, I guess, stated the termination was initiated by Kathleen Berry, who had no knowledge of Flores' complaint. I don't know whether that's what was filed, whether it was a draft that was later corrected. I don't see any record site at all. Where is it from? You know, and I apologize. I see that there is no site there. There should be a site. The very same fact was in the summary judgment documents below. So in the record, there is a site. I can certainly go through those and dig those out and supply it to the court. There was a meeting in October of 2007 between Strauss and Flores that resulted in what I know the defense will say is sort of a blow-up. It is our position that this so-called blow-up between the two of them was initiated by Strauss as a way to try to provoke Mike Flores into engaging in subordinate activity. Is that the incident where Berry tried to get Ms. Leal to lie about what happened to FHR Enquiry? Correct. Correct. And that's what I was just leading up to. We do have an independent witness who said that it was Strauss who was slamming doors, who was yelling, who was acting unprofessionally. And Berry clearly knew that that was the case because she goes to Leal knowing that Leal is aware of this and basically bribes her. In fact, specifically bribes her. I'll return you to the office that I moved you out of earlier this year if you'll do me a favor and not provide that information to HR. And she was indeed moved back to the office of her choice. So this isn't a case where Berry can say, well, I wasn't there but Strauss tells me this is what happened so I'm making a good faith decision to take action against Mr. Flores. It wasn't in good faith. She knew that that's not what happened and that's why she bribed Ms. Leal concerning that. January 2008, Ms. Hurt in HR, in fact she's the person that they made the complaint to, wrote a letter seeking Mr. Flores' termination. In this she said he was an inconsistent salesperson and this is totally disputed by the record. In fact, it's proven wrong by the record. In the last two-month cycles he had 21 starts as his goal and he in fact achieved 21 starts. Truth is during one of the two-month period he was down two and another one he was up two, but the record is clear and everyone agrees that they don't pound on these individual two-month dates as long as you're on track. In fact, the year before that letter was written, if you look at all his sales, he was more than 20 ahead of his sales goals. But what's most important about that letter is that it also says in it, Flores is also one of the people who complained about a previous supervisor with Liz Castro. Now, the spin that the bribe puts on this is while she was just warning them, let's be careful here, this person engaged in protected activity, and that in fact is the spin that the district court accepted. But that's not what the letter says. There's no reference to protected activity or let's be careful about what we do here. Instead, that statement that he was a person who complained about his supervisor was put in a paragraph that consisted solely of negative things about Mike Flores that would justify his termination. In June of 2008, Hurl, the person who made the wetback statement in 2007, asked that Brooks be put on probation and then be terminated at the end of her probation, which sort of makes her probation something of a joke. Her justification for that was Brooks' sales numbers. But as we showed, based on sales documents produced by DeVry, the numbers she put in her memo seeking Brooks' termination were not accurate. They were false. Her numbers actually were much greater than that. However, DeVry argues, well, the documents we turned over, we don't think they're authentic. That was their objection. Those documents haven't been authenticated, and so they should be disregarded. They didn't provide correct documents. They actually never said they were inaccurate. They just asked the court to disregard them, and disregard them, the district court did. The record will show that the reviews given to Liz Castro from the time of the complaint each and every time were manipulated in ways to make her look bad. The best example is July of 2009, leading up to her termination. Despite the fact that Liz had been out on a medical leave, she met her goal of 24 starts. She had 24 starts, but her supervisor, Tobin, took two of those away, actually whited out her name on documents and inserted her name on one and another advisor on another to take her below that. She never could explain why she did that at her depth. In fact, more importantly, she also, in the review, while she acknowledged that she had to, that Liz had met her goals, in the category of production goals, she wasn't rated as meets. She was a level below, even though she had met her goals. I see I'm into my rebuttal time now, but the record is replete with disputed facts which the district court resolved in favor of DeVry, and that's why I think this should be reversed. Mr. Crooks, just a couple of quick questions. Frankly, I thought it was pretty clear that Castro had, I mean, by the time she was fired, there was a lot of water under the bridge since this meeting back in 07. And I thought it was pretty clear that she'd been meeting, that she'd been missing goals even after they had been adjusted downward. Everybody was missing their goals. And first of all, it's our contention, I think we have the evidence there, that the goals were not adjusted. She had an automobile accident when she was transferred to Addison and was hospitalized. She had a baby, took a maternity leave, and she was out based on doctor's advice for depression as a result of the events of this case. So she did miss time. Her goals were never actually prorated. And going to September of 2009, just when she was fired, they say, well, she only had one start. Well, in fact, nobody had more than one start except the supervisor who had two. Everybody missed their goals. Is that spelled out for us in the brief? I believe it is. I believe it is, Your Honor. Yes. Maybe I missed it. I'm sure it's there because that's what I read in preparation. I'm sure it's there. Thank you, Mr. Crooks. Mr. Stoltenbach. Good morning. Brian Stoltenbach on behalf of DeVry. This is a case that doesn't present any real complex legal questions. It's all about the facts, which we believe are undisputed to the extent they're material. It's, in fact, three separate cases mashed into one, and there's a single question for this court as there was for the district court in each of the three cases. Is it really plausible that Kathy Berry terminated each one of the individual plaintiffs because they complained about Phil Gamboni on April 16, 2007? And I think the district court's decision in this respect was clearly correct. And you could see this if you imagined plotting each of the plaintiffs' careers at DeVry on a sort of line graph. And if you imagined the y-axis being the relative favorableness of treatment at DeVry, and, of course, the x-axis just being time, if the plaintiffs were correct, what you'd expect to see is all of them kind of clicking along at a high level on the y-axis until April 16, 2007, at which point you would expect all three of their lines to plummet rather quickly down to termination. But if you look at each individual plaintiff and you imagine them in a similar fashion with a line graph, what you would see are three drastically different paths. Mr. Flores was a relative superstar before the complaint in Mr. Gamboni's relatively rough and tumble world, and he continued to be so for months after the complaint about Mr. Gamboni. He received an excellent review, in Mr. Flores's own words, three months after the complaint from Mr. Gamboni himself. At the same time, Ms. Hurrell, who was Mr. Gamboni's boss, met with Mr. Flores and told him he should be a mentor to others and she wanted him to be a manager one day. A few months after that, in September of 2007, his new boss, Julie Strauss, recommended him for the Pride Award, which is a prestigious award inside of DeVry. That recommendation was approved by not only Ms. Hurrell, but Ms. Berry, who by that point had taken over for Mr. Gamboni, who was gone to another job within DeVry. And so what you see, if you look backwards on this imaginary line graph, is a full six months after the complaint about Mr. Gamboni of a line way up high on the graph of favorable treatment, continuing on the same trajectory it had been on before April 16th, as though nothing even happened on April 16th. The graph only plummets down through the floor after October 17th, 2007, when Mr. Flores and Ms. Strauss have what he describes as a blow-up with each other. And he reports her to HR, notably not complaining that she was discriminating or retaliating against him, but just complaining that she was a mean boss. From there we see a missed performance goal in November of 2007 for Mr. Flores. We see teach values of zero at the end of October of 2007, based on the blow-up. We see another criticism of Mr. Flores in late January 2008 from Ms. Strauss for not performing phone work like he was supposed to. That's undisputed. And then we have the final incident, which is Mr. Flores hijacking a meeting with Ms. Berry, designed to do actual work, and complaining about the teach values from months previously. He's shortly thereafter terminated. If you look at Ms. Brooks. Can we talk about Mr. Flores for a moment? Yes, sir. I'm looking at Ms. Hurt's email to Marr on February 4th, 2008. I don't think I've ever seen a memo like this in a retaliation case where summary judgment was granted, identifying the protected conduct in the list of reasons for the recommendation of termination. Now, I understand you might be able to argue that's not what this means, but why is that not a reasonable reading of this? Because Ms. Hurt in the first email, which you referenced, Your Honor, says that he's being terminated for two reasons. One is performance. The other is his volatile behavior, which she describes as blow-ups with his management. Now, we know one blow-up was with Ms. Strauss, and we know that the other one, which is specifically referenced here as the last blow-up, was with Kathy Berry. Okay, that's the two numbered bullet points. But he's also one of the people who complained about a previous supervisor with Liz Castro, and he's constantly challenging every decision his supervisor makes is racially motivated. She does not describe the complaint about Liz Castro as one of the reasons for his dismissal. She describes, she bullet points two things. Are you saying as a matter of law we parse things out that tightly? I believe so, Your Honor, because she mentions two specific things, and I want to finish out this thought. One of them is blow-ups. And it's clear that the complaint about Mr. Gamboni did not involve any kind of blow-up by Mr. Flores or by Mr. Gamboni. And it's also clear that when she references challenging every decision his supervisor makes is racially motivated, if you look at Kathy Berry's description of the last event that got him terminated, Kathy Berry does, in fact, describe Mr. Flores as constantly challenging things that's racially motivated. Now, if this were a case alleging that Mr. Flores was terminated unlawfully for challenging discrimination in the meeting with Kathy Berry, we think we would still have an argument, but we might not be arguing about summary judgment. What the district court clearly said, and Mr. Crooks admitted it, oral argument, is that this case is about whether he was fired for his complaint about Mr. Gamboni, April 16, 2007. Which is also part of this memo. It is mentioned as a refresher, and as Ms. Hurt described, to highlight a risk. And if you look at Exhibit O to Ms. Castro's declaration, which was an email sent shortly thereafter, she specifically identifies once again what the reasons are for Mr. Flores' dismissal, and she does not include anything about Mr. Gamboni. She does not include anything... It would be an unusual retaliation case in which every piece of evidence reflected retaliatory intent, right? It would indeed. You've seen enough of these. She specifically says that separating him would be a risk, consistent with her testimony. At the end of the day, Mr. Flores was terminated by Kathy Berry. There's no suggestion that anyone else made the decision. What's HR doing talking about it? HR is providing consultation to her about whether it is an appropriate decision, and in so doing, discussing the risk that may be posed that we could have litigation with Mr. Flores, who's engaged in protected activity, a risk we're living out today. Mr. Flores was treated fabulously by Mr. Gamboni and by Ms. Hurrell for months, and by Ms. Berry for months after the complaint. Could I ask you a couple of other factual questions, counsel? Yes, sir. In your brief, you say that Mr. Flores destroyed some notes that were important. He did. Your record citation there referred to some of his deposition testimony. Yes. The critical pages are not in the record. It skips a page. I believe they were attached to our reply brief.  In the district court. We looked for the pages, and it stops just as things get interesting. I can tell you that he testified that he did have two sets of typed notes. Where do we find this testimony? In his... Okay. Let's not dwell on that right now. Let's go to some other documentary issues. With respect to Ms. Brooks and her sales targets, and specifically the exhibits that were offered with support from Castro's affidavit. Castro basically is saying, take these at face value, and the numbers they indicate for Brooks are very different from the numbers that were used to justify her termination. Instead of missing her targets, she doubled her targets. Does DeVry... Have you at any point disputed the accuracy of these figures for January 2008 and May 2008? Your Honor, I don't even know what those documents are myself. They've been at the center of this controversy. They've been hotly disputed. Are you saying that you have no information about their accuracy? I am saying that, Your Honor, because they have not been at the center of this case. They were never mentioned in a deposition. They were never mentioned by anybody. They're in Castro's affidavit. After everybody was deposed and we moved for summary judgment, she raised it and said, look, DeVry produced these. I don't know. Honestly, I do not know what they are. I do not know whether they're accurate. I do not know... Could you address, then, the... There's an opinion by this court. It's difficult to pronounce, but Tanong Sin against Board of Education, 462 F3rd 762, which at pages 777 through 778 deals with a very, very similar kind of problem and says, in summary judgment, you can use these. I'm not familiar with the case, Your Honor. I will say this, that it is undisputed that Ms. Brooks missed her July 2008 target. She testified to it. She hasn't disputed it. She has, at times, attempted to argue... I assume, though, you guys didn't fire people for missing one target. Not necessarily. It was the most important target of the year. Everybody agrees. But what is omitted from all the discussion about her performance is the dishonesty issues that arose in June 2008. I would not suggest to you that I know for a fact that she would have been terminated for performance absent those issues. I don't think she would have been. But those issues are there, and they're undisputed. Students told her supervisors that she was not visiting them or dealing with them on a day in which she was late to the office and claimed she was busy with those students. That's a significant issue. That's undisputed. And that was relied upon by Ms. Berry in making the decision, as she testified in her deposition. And Ms. Brooks experienced the same long-term experience as Mr. Flores in that she received two positive good reviews from Mr. Damboni and then from Ms. Berry after her complaint. It was only more than a year later when she was dismissed after these issues of dishonesty arose, combined with missing her biggest target of the year two weeks later. Could I also ask you to address this question about Flores and the blow-up with Strauss and the evidence that Berry got Mara Leal to lie to HR about that incident? That's pretty unusual evidence, too. I would say, Your Honor, that there is certainly a dispute about what happened exactly between Ms. Strauss and Mr. Flores. Is there a dispute about whether Berry made this offer to Leal? Well, for purposes of summary judgment, we have to assume that she made it. Right. So there was a move of offices. There is evidence that suggests a perfectly innocent reason as to why she moved offices and was moved back. But all the consternation about that particular incident still would have to be tied back to the complaint about Mr. Damboni for there to be any evidence that Ms. Berry was out to get Mr. Flores or Ms. Strauss was out to get Mr. Flores because of Mr. Damboni. Now, Ms. Strauss testified that she didn't know anything about the complaint regarding Mr. Damboni until this lawsuit was filed. There's no contrary evidence. And if Ms. Strauss had a blow-up with Mr. Flores, which was disputed, Mr. Flores then went and complained about Ms. Strauss because of the dispute, and Ms. Strauss was Ms. Berry's favorite lieutenant. There may be various reasons why Ms. Strauss won the day in the dispute with Mr. Flores when people decided who was at fault. There's no evidence to suggest it was because Mr. Damboni had suffered a complaint six months previous to that. Now, the plaintiffs focus on alleged comments that Ms. Berry and Ms. Strauss told the entire group in Chicago when they took over, you know, don't go to HR with your problems, please come to us first. Is that how it was phrased? That's how it was phrased by the one witness who testified to Ms. Berry's statement in the group meeting. Come to us first. Come to us first so I can resolve it. Now, that was Ms. Brooks' testimony. Mr. Flores didn't recall any such statement in the group meeting. Mr. Flores testified contrary to Ms. Brooks that there was a private meeting with Julie Strauss where she said, don't go to HR, Kathy Berry is different, the people who go to HR aren't here anymore. Now, I don't think that it's appropriate for a court to discredit plaintiffs on one issue and credit them on others in order to cobble together a story that is, you know, Were they describing the same meeting or not? No. Well, they both testified about both the whole situation and only one testified that the issue occurred at the group meeting that they were both at and only one testified that the private meeting occurred at all. Despite both being asked clearly, describe for us all the retaliation you experienced and all the evidence of retaliation that you experienced. I'm just trying to understand. Maybe we just need to review the transcripts to see what it just, is that complimentary or flatly contradictory testimony? Well, I believe it's contradictory because both, Mr. Flores did, in fact, testify about the group meeting and what he remembered of it and he did, he testified that, you know, issue that Ms. Berry supposedly raised didn't occur. Ms. Brooks, when asked to testify about all the retaliation she experienced, mentions nothing about this alleged private meeting. But assuming we can assume that it happened, it still is only evidence that Ms. Strauss and Ms. Berry may not have liked it if a plaintiff went to HR about them later on, which, of course, Mr. Flores did at one point at the beginning of his downfall. And Ms. Strauss, when she said, what she is alleged to have said is, don't go to HR, people who go to HR aren't here anymore. Well, she's supposedly talking to the plaintiffs at that time who clearly are there. So she can't have believed that they went to HR to complain about Mr. Gamboni while at the same time claiming that everybody who went to HR to complain no longer works there anymore. Where was Castro at that point? Castro was moved to a different location. Before or after that meeting? Around the same exact time. I see I'm out of time. If you have any other questions, happy to answer them. If not, I'll turn it over to Mr. Crooks. Thank you, Counselor. Mr. Crooks, I'd like you to respond to what for me is the focus of the case, and that is that we've got three individuals who have a 10-month, 15-month, and 26-month. It seems a pretty fact-intensive case, but we've counseled against drawing an inference when there's a substantial gap in retaliation cases, and I'm sure you're aware of that. Many cases, I understand that, Your Honor. So we're, I don't want to say pushing the envelope, but we're in kind of extended territory on time here. So against that backdrop and against what the Supreme Court did in the University of Texas, the Medical Center versus Nassar, which seemed to underscore this but-for causation test, if anything, seems to me made it tougher in the retaliation context when you have this extended time. How does this case fit in that frame? Any competent defense counsel, and DeVry has competent counsel, would certainly focus on that gap in time. No question about it. I'd point to Hessen versus Foley and Lardner. It was approximately 16 months after the act that sparked everything resulted in his termination, and I think what the courts have said, and this is difficult for people to prove, so you don't see very many of them. What the courts have said in Hessen, and I think implicitly in Viprinsky versus Flor-Daniel, is that if you can show that the retaliation started immediately, eventually led to the terminations, and frankly I'm sure Castro would have been gone sooner if she had not had so many health problems and been absent for so many periods of time, but clearly they couldn't go after all three. They would decimate the Chicago office. The best performance in Chicago office all gone at once doesn't make sense. Flores, he doubled his quota in July of 2007, so when counsel says, well, look how well he's treated. He got a good review. He went to pride. Well, how could they not? I'd love it if they were to fire somebody after they doubled their sales goals. It would make my retaliation case much easier to prove. So is it your point that we should do this, that the seeds of retaliation start immediately after the HR complaint? Right, and they did. They can't grow for the reasons you suggest, that there's a company need for people, and then they build up by accretion, and the seeds of retaliation, if you will, start to grow and flower.  And we can see all of that as the bud for the final termination? With as much evidence as you have here, I think you can see that. For example, it's our contention that when Strauss tried to provoke Flores in October of that same year, it didn't work. He went to HR and complained about the way he was treated. I think that connection can be made. And if I could just do very quickly, I was asked for a cite. Judge Hamilton also has an inquiry. Page 9 of the reply brief, with one correction. It wasn't September. It was November of 2009. Castro had one start, and Berry had two starts. No advisors in the region had more than one. And that's page 9 of my reply brief. Thank you. If I could just follow up on one matter having to do with Plaintiff Brooks. And we've got this issue that's been hotly disputed about whether she was meeting her targets or not with the documents at issue. We've got this other issue, though, about honesty or dishonesty about what she was doing. Right. I didn't see that really disputed. It was disputed. And here's how it is disputed. And I'm going to say this generally. There were two incidents that were very similar. Her supervisor said, I called and I talked to that student, and that student said, you didn't stop by and see. And Brooks, being confronted with that that very same day, said, no, I didn't see him. I saw his mother, and I got the check from his mother, or words to that effect. Why don't you call right now and we can talk to her without me having a chance to fake any testimony or any statement? And Strauss chose not to make that call and took no action as a result of those incidents. Only down the road did they go back. Was that in June? What happened? Of 08? Pardon me? Was it June of 08? It was around that time. In my recollection, it was late spring, early summer, around that time. So instead, they just let those things sit there, and then they backstated and decided later. Those are the reasons. Thanks, Brooks. Thanks to all counsel.